Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Tiffany A. Tavernier**, | Case No. 21-31157-dwh7 |
| Debtor. | |
| **VL Wallace Investments, LLC,** d/b/a Transworld Business Advisors of North DFW, | Adversary Proceeding No. 21-03030-dwh |
| | MEMORANDUM DECISION ON SUMMARY-JUDGMENT MOTIONS AND MOTION TO DISMISS |
| Plaintiff, | |
| v. | |
| **Tiffany A. Tavernier**, | |
| Defendant. | |

# I.    Introduction[1]

In this action, plaintiff, VL Wallace Investments, LLC, seeks a determination that its claim against debtor, Tiffany A. Tavernier, is not dischargeable. The principal of VL Wallace is Vicki Wallace. I will refer to VL Wallace as Wallace and to Vicki Wallace as Vicki.

Wallace has moved for partial summary judgment on Tavernier's second through fourth affirmative defenses.[2] Wallace has also moved to dismiss Tavernier's affirmative defense of setoff.[3] Tavernier has moved for summary judgment on Wallace's two nondischargeability claims.[4]

For the reasons that follow, I will—

- deny Tavernier's motion for summary judgment denying Wallace relief on its two nondischargeability claims,

- deny as moot Wallace's motion for summary judgment on Tavernier's second affirmative defense of statute of limitations because Tavernier has withdrawn that defense,

- deny Wallace's motion for summary judgment on Tavernier's third affirmative defense that the two covenants not to compete are unreasonable and thus unenforceable,

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.
[2] ECF No. 23.
[3] ECF No. 28.
[4] ECF No. 30.

- grant Wallace's motion for summary judgment on Tavernier's fourth affirmative defense that Wallace failed to make required payments to reimburse her for payments to Texas Legends, LLC, and

- defer to trial further consideration of Wallace's motion to dismiss Tavernier's fifth affirmative defense that Wallace failed to make installment payments due to Tavernier—as well as whether I should order the trustee's joinder.

Because Tavernier's motion addresses both of Wallace's claims for relief in the complaint and would, if granted, terminate this action, I will first address her motion and then turn to Wallace's two motions.

## II.    Facts

On April 19, 2017, Tavernier's company, Swartz Brokerage, LLC (Swartz is Tavernier's former last name), entered into a sponsorship agreement with Texas Legends, LLC, an NBA G league team based in Frisco, Texas. Swartz Brokerage agreed to pay Legends $100,000 as a sponsorship for the 2018–19 and 2019–20 NBA Development League seasons.[5]

On May 15, 2018, Wallace bought from Swartz Brokerage and Tavernier a business-brokerage business called Transworld Business Advisers of North DFW and the brokerage's assets. The purchase was made in a Purchase

---

[5] ECF No. 24 at 3 ¶ 4; ECF No. 46 at 2 ¶ 4.

Agreement. The purchase price included monthly $10,000 installment payments.[6]

The property Tavernier sold included "property and assets used in connection with the Business" that she sold,[7] including all "customer accounts and rights and agreements of Seller to provide Services . . ."[8] and any "equipment, paperwork, . . . and supplies of every kind owned by [Tavernier] and used in the operation of the Business . . .."[9]

Tavernier agreed in paragraph 14.(j) to enter into a separate Independent Contractor Agreement and "continue to serve as a sale agent for" Wallace for at least five years, terminable at will by Wallace. In paragraph 14(e), she agreed for the later of five years or two years after termination of her services under the Independent Contractor Agreement not to engage in Texas in a business in direct competition with Wallace, "including any activities involving the business brokerage industry and the listing, promotion and purchase and sale of third-party businesses." She also agreed not to interfere with business relationships, whether formed before or after the purchase, between Wallace and its customers and clients or "encourage [Wallace's] customers or clients to cease to be a customer or client of [Wallace] or

---

[6] ECF No. 26 at 2 ¶ 3, Ex. A at 3 ¶ 3(a)(iii).
[7] ECF No. 26 at 2 ¶ 3, Ex. A at 1 ¶ 1.
[8] ECF No. 26 at 2 ¶ 3, Ex. A at 1 ¶ 1(b).
[9] ECF No. 26 at 2 ¶ 3, Ex. A at 2 ¶ 1(f).

Page 4 – MEMORANDUM DECISION ON SUMMARY-JUDGMENT etc.

encourage such customers to do business with [Wallace's] competitors." Tavernier agreed that those restrictions were reasonable.

In the Independent Contractor Agreement, also dated May 15, 2018, Tavernier agreed for five years to "sell business opportunities, franchises, or business enterprises listed with [Wallace] and to solicit additional listings for" Wallace.[10] Either party could terminate the agreement at any time.[11] She also agreed for the term of the agreement plus five years (not the two years mentioned in the Purchase Agreement) she would not "engage in any business brokerage activity in competition with the services provided by [Wallace] in any county in which [Wallace] conducts business."[12] As an owner of a Transworld franchise, Wallace was not permitted to do business in any territories other than those that it owned.[13] Wallace had owned one territory and acquired three from Tavernier.[14]

On July 23, 2018, the parties entered into an addendum to the Independent Contractor Agreement. The addendum increased the commissions to be paid to Tavernier, and Wallace agreed to reimburse Tavernier to permit Tavernier to "uphold" the Legends sponsorship agreement. Wallace would make certain payments to Tavernier while the Legends contract remained in place. If the Legends contract ended sooner

---

[10] ECF No. 26 at 3 ¶ 5, Ex. B at 3 ¶ 6.
[11] ECF No. 26 at 3 ¶ 5, Ex. B at 1 ¶ 2.
[12] ECF No. 26 at 3 ¶ 5, Ex. B at 3 ¶ 21.a.
[13] ECF No. 32 at 2 ¶ 4; ECF No. 38 at 2 ¶ 4.
[14] ECF No. 32 at 1 ¶ 3; ECF No. 38 at 2 ¶ 3.

than anticipated, the commission structure would "revert to regular scale and payments from [Wallace] would no longer continue."[15]

Tavernier worked for Wallace through December 16, 2019, when she moved to Oregon.[16]

Wallace didn't pay Tavernier the Legends reimbursement payments due from and after October 10, 2018.[17] On September 17, 2019, Legends sued Swartz Brokerage for breach of the sponsorship agreement.[18] On December 23, 2019, Legends and Swartz Brokerage entered into a settlement agreement.[19] In return for a payment to Legends, Legends released Tavernier, Swartz Brokerage, Wallace, and Vicki, among others. Legends agreed promptly to request the removal of all negative or adverse credit reporting of Swartz Brokerage.[20] Wallace made the settlement payment to Legends.[21]

Wallace did not pay Tavernier the two $10,000 purchase-price installment payments due on November 15 and December 15, 2019.[22]

---

[15] ECF No. 26 at 3 ¶ 7, Ex. C.
[16] ECF No. 32 at 2 ¶ 8; ECF No. 38 at 2 ¶ 8.
[17] ECF No. 32 at 2 ¶ 13; ECF No. 38 at 2 ¶ 13.
[18] ECF No. 24 at 3 ¶ 6; ECF No. 46 at 2 ¶ 6.
[19] ECF No. 26 at 4 ¶ 9, Ex. D.
[20] ECF No. 26 at 4 ¶ 9, Ex. D at 3 ¶ 8.
[21] ECF No. 24 at 3 ¶ 6; ECF No. 46 at 2 ¶ 7.
[22] ECF No. 32 at 2 ¶ 12; ECF No. 38 at 2 ¶ 12.

### III. Tavernier's motion for summary judgment

Tavernier requests summary judgment on Wallace's two claims, which are under 11 U.S.C. § 523(a)(4) and (6).[23] The two claims both address the same debt: the damages Wallace claims for Tavernier taking its property, including tangible property and the value of rights to earn business-sale commissions.

#### A. 523(a)(4) claim: larceny or embezzlement

The 523(a)(4) claim is for the value of two computer monitors, a mirror, "confidential business forms," and "listings."[24]

Under 523(a)(4), a debt is excepted from discharge if it is "for . . . embezzlement, or larceny." Larceny under 523(a)(4) is a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same."[25] It involves a taking that was originally unlawful, as distinguished from embezzlement,[26] which is "the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come."[27]

---

[23] ECF No. 30.
[24] ECF No. 1 at 5 ¶ 20.
[25] Ormsby v. Fist Am. Title Co. of Nev. (*In re* Ormsby), 591 F.3d 1199, 1205 (9th Cir. 2010).
[26] *In re* Lewis, 551 B.R. 41, 50-51 (Bankr. E.D. Cal. 2016).
[27] Moore v. United States, 160 U.S. 268, 269-70 (1895) (criminal case); *In re* Wallace, 840 F.2d 762, 765 (10th Cir. 1988); Clark v. Farris-Ellison (*In re* Farris-Ellison), Case No. 2:11-bk-33861-RK, 2022 WL 4542757, at *29 (Bankr. C.D. Cal. Sep. 28, 2022).

Page 7 – MEMORANDUM DECISION ON SUMMARY-JUDGMENT etc.

### 1. Arguments

Tavernier finds it "difficult to imagine how someone could steal a listing."[28] She concedes that she "took or reclaimed" the monitors and a mirror, but she claims to have done so "under a reasonable belief that she had the right to take them."[29] She claims that, because she "was owed $20,000 by [Wallace]," she "believed that the contracts with [Wallace] were in default and null and void and [the monitors] were mine."[30] She denies that the mirror was Wallace's property.

### 2. Analysis

Tavernier concedes that the distinction between larceny and embezzlement doesn't matter here.[31]

Tavernier has not pointed to any authority that intangible property, such as rights under listing agreements or business opportunities, isn't property that can be the subject of larceny or embezzlement.

It appears undisputed that Wallace didn't make the two $10,000 installment payments. Assuming that Wallace was not justified or excused in failing to make those payments, Tavernier points to no provision of Texas law that would allow Tavernier to exercise self-help by taking or retaining property of Wallace. Tavernier doesn't dispute that she sold Wallace the

---

[28] ECF No. 33 at 2–3.
[29] ECF No. 33 at 2–3.
[30] ECF No. 31 at 4 ¶ 20.
[31] ECF No. 33 at 2-3.

property, other than the mirror (which is in dispute). Tavernier had performed the Purchase Agreement before Wallace's failure to pay.

Tavernier asserts that "the mirror was an old mirror that I had taken from my home, and I do not believe that it was sold to [Wallace]."[32] But she doesn't contend that the mirror wasn't at the business premises at the time of the Purchase Agreement. Nor does she contend that Wallace knew that the mirror was from Tavernier's home or that Wallace agreed to exclude the mirror from the sale. Wallace asserts that the property it bought specifically did include the mirror.[33] There thus exists a genuine issue of material fact whether the mirror was sold.

Tavernier offers no legal authority for her implicit argument that, as a matter of law, a business-broker listing doesn't create an intangible property interest in favor of the broker that could be the subject of a claim for larceny or embezzlement.

I will deny Tavernier's motion on the 523(a)(4) claim.

### B.    *523(a)(6) claim: willful and malicious injury*

#### 1.    **Arguments**

Tavernier makes two arguments against the 523(a)(6) claim. First, she argues that she did not act willfully, in the sense that she neither subjectively intended harm nor acted knowing that harm would result.[34]

---

[32] ECF No. 31 at 4 ¶ 20.
[33] ECF No. 30 at 3 3 ¶ 5.
[34] ECF No. 33 at 3.

Second, she argues that Wallace has not alleged any conduct by Tavernier that could constitute tortious conduct, rather than just breach of contract.[35]

## 2.      Whether Tavernier acted willfully

In the Ninth Circuit's 2002 decision in *Carillo v. Su (In re Su)*, it held that finding of 523(a)(6) nondischargeability can be based on the debtor's "subjective intent to cause harm or knowledge that harm was substantially certain."[36] Tavernier asserts that "there are no facts that will establish that [Tavernier] did anything with the knowledge that it would cause a substantial injury to [Wallace]."[37]

Tavernier doesn't argue that she did not do the acts alleged—the taking of property, including business opportunities—at all or even without intending to do so or even that the acts didn't injure Wallace. Rather, the only basis on which she appears to argue that her acts weren't willful is to argue that they weren't wrongful. Because I will rule against her motions, leaving both nondischargeability claims to be resolved at trial, the wrongfulness of her acts remains an issue for trial, and I cannot determine now that she didn't act willfully.

---

[35] ECF No. 33 at 3.
[36] 290 F.3d 1140, 1145 (9th Cir. 2002).
[37] ECF No. 33 at 3.

### 3. Whether Tavernier acted tortiously

#### (a) *Ninth Circuit case law*

In the Ninth Circuit's 1992 decision in *In re Riso*,[38] the court held that an intentional breach of contract is excepted from discharge under 523(a)(6) only when accompanied by malicious and willful tortious conduct. In the court's 2001 decision in *In re Jercich*, it held that the tort need not be tortious in the absence of a contract.[39]

#### (b) *Kinzbach*

Wallace argues in its memorandum opposing the motion that its 523(a)(6) claim is based in part on her "breaching her fiduciary duties (including usurping and interfering with [her] corporate opportunities)."[40] In Vicki's declaration,[41] she contends that Wallace "paid a premium for the Company [the purchased assets] for assurance that Ms. Tavernier would be working with me (as a producing salesperson) rather than competing against the Company."[42] Tavernier's reply addresses the issue of fiduciary duty only by arguing that Wallace has failed to allege that she was a fiduciary.[43]

Responding to Tavernier's argument that Wallace hadn't alleged that Tavernier was a fiduciary, Wallace filed a supplemental opposition to the motion, citing the Texas Supreme Court's 1942 decision in *Kinzbach Tool*

---

[38] 978 F.2d 1151, 1154 (9th Cir. 1992).
[39] 238 F.3d 1202, 1205 (9th Cir. 2001).
[40] ECF No. 37 at 2-3.
[41] ECF No. 39.
[42] ECF No. 39 ¶ 6.
[43] ECF No. 53 at 2.

*Co v. Corbett-Wallace Corporation*.[44] A "fiduciary" is "any person who occupies a position of peculiar confidence towards another"[45] and includes "those informal relations which exist whenever one party trusts and relies upon another."[46] In part because "Turner was a trusted employee of Kinzbach, receiving his pay regularly by the month . . . for some seven years," the court found that Turner had and abused a fiduciary relationship with Kinzbach.[47] Turner's position "called on him to make full disclosure to his employer of all the facts and circumstances concerning his dealings" with a counterparty on behalf of Kinzbach.[48] If a fiduciary "acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."[49]

    Comparing *Kinzbach* to this action, Wallace points to its evidence that it "paid a premium for [Tavernier's] Company for assurance that Ms. Tavernier would be working with me (as a producing salesperson) rather than competing against the Company."[50] Wallace asks that I infer from that evidence that Tavernier "was a trusted key player in [Wallace's] purchase of

---

[44] 160 S.W.2d 509 (Tex. 1942).
[45] 160 S.W.2d at 512.
[46] 160 S.W.2d at 512-13.
[47] 160 S.W.2d at 513.
[48] 160 S.W.2d at 514.
[49] 160 S.W.2d at 514, quoting United States v. Carter, 217 U.S. 286, 306 (1910)
[50] ECF No. 39 at 3 ¶ 6.

Page 12 – MEMORANDUM DECISION ON SUMMARY-JUDGMENT etc.

[Tavernier's] Business." Wallace argues that Tavernier acted as a fiduciary to Wallace and that "[f]iduciary law makes [Tavernier's] conduct actionable rather than the contracts which govern the parties' relationship."[51]

In Tavernier's response, she argues that this action differs from *Kinzbach*. There, the employee had worked for the employer for seven years, received a monthly salary, and was trusted by the employer. Here, Tavernier was an independent contractor, worked for Wallace less than a year without salary, was required to pay her own expenses and insurance without any guarantee of income, Wallace could terminate her at will and she denies that there is evidence, other than the engagement itself, that Wallace trusted Tavernier.[52]

### (c)   *Analysis*

Although *Kinzbach* reports the facts of Turner's status as seven-year salaried employee, nothing in it holds that only an employee, and not an independent contractor, can be an agent with fiduciary duties to the principal. Nor does it hold that a fiduciary relationship exists only if the principal perceived the agent to be "trusted"—at least to any extent greater than every principal is entitled to trust every agent. The court's analysis begins by reciting the principles that a fiduciary is "any person who occupies a position of peculiar confidence towards another" and includes "those informal relations which exist whenever one-party trusts and relies upon

---

[51] ECF No. 64 at 2.
[52] ECF No. 66.

another . . .." I am unable to agree with Tavernier that an independent contractor can never be a fiduciary.

There is a genuine issue of material fact whether Tavernier was a fiduciary to Wallace such that a breach would constitute a tort supporting 523(a)(6) nondischargeability. I will deny Tavernier's motion for summary judgment on the 523(a)(6) claim.

## IV.    Wallace's motion for summary judgment

Wallace seeks partial summary judgment on three of Tavernier's affirmative defenses: statute of limitation, unenforceability of the noncompetes, and breach of contract.[53]

### A.    *Tavernier's second affirmative defense: statute of limitations*

Tavernier's second affirmative defense is that Wallace's claims "may" be time-barred.[54] In Tavernier's response to Wallace's motion, she withdrew that defense,[55] mooting Wallace's motion against that defense.

I will deny as moot Wallace's motion for summary judgment as to Tavernier's second affirmative defense.

---

[53] ECF No. 25 at 2.
[54] ECF No. 15 at 3 ¶ 15.
[55] ECF No. 42 at 1.

### B.     *Tavernier's third affirmative defense: noncompetes' enforceability*

#### 1.     Motion

Wallace's 523(a)(6) claim incorporates by reference its allegation that Tavernier was bound by but breached noncompetes in the Purchase Agreement and Independent Contractor Agreement.[56] In support of that claim, Wallace alleges that Tavernier did things "prohibited by the clear terms of the Purchase Agreement and Independent Contractor Agreement," including "usurping [Wallace's] business brokerage opportunities . . .."[57]

Tavernier's third affirmative defense is that the noncompetes are unenforceable because they are not reasonable limitations as to time, geographical area, and scope of activity.[58]

Wallace moves for summary judgment in its favor on the third affirmative defense.[59]

#### 2.     Statutes and case law

The Texas Business and Commercial Code subchapter E, §§ 15.50-.52, regulates noncompetes. Under section 15.50(a), if a noncompetition covenant is ancillary to an otherwise enforceable agreement when the agreement is made, the covenant is enforceable to the extent that its limitations as to time, geographical area, and scope of activity to be retrained are reasonable and do

---

[56] ECF No. 1 at 3, 4–6 ¶¶ 10–14, 28.
[57] ECF No. 1 at 6–7 ¶ 29.
[58] ECF No. 15 at 3 ¶ 16.
[59] ECF No. 23 at 2; ECF No. 25 at 8–12.

not impose a greater restraint that is necessary to protect the promisee's (employer's or principal's) goodwill or other business interest.

Under section 15.51(b), if the primary purpose of the agreement to which the noncompete is ancillary is to obligate the promissor (employee or independent contractor) to render personal services, the promisee (employer or principal) has the burden of establishing that the noncompete satisfies section 15.50.

In the Texas Supreme Court's 2001 decision in *Stone v. Griffin Comm. & Security Sys.*,[60] the court held that the reasonableness of the scope of a noncompete is a function of—

> (1) whether the restriction is greater than necessary to protect the business and goodwill of the employer, (2) whether the employer's need for protection outweighs the economic hardship that the noncompete imposes on the employee or independent contractor, and (3) whether the restriction adversely affects the interest of the public. . . . The restrictive covenant must bear some relation to the activities of the employee and not restrain the employee's activities into a territory into which [the employee's] former work had not taken [the employee] or given [the employee] the opportunity to enjoy undue advantages in later competition with [the] former employer.[61]

### 3. Wallace's argument

Wallace argues that the covenants are enforceable under Texas law because they are reasonably limited in scope and are legitimately related to

---

[60] 53 S.W.3d 687, 696 (Tex. Ct. App. 2001), overruled on other grounds, Am. Francmaster, Ltd. v. Richardson, 71 S.W.3d 381 (Tex. Ct. App. 2001).
[61] Stone v. Griffin Comm. & Security Sys., 53 S.W.3d 687, 696 (Tex. Ct. App. 2001), overruled on other grounds, American Francmaster, Ltd. v. Richardson, 71 S.W.3d 381 (Tex. Ct. App. 2001).

the parties' transaction.[62] Wallace says that the purchase of the brokerage was based on the understanding that Tavernier would remain with the company as a broker and would not compete with it, and the transaction would never have happened without that mutual understanding.[63] Wallace also argues that the noncompetes are reasonable because they were necessary to prevent Tavernier from undermining the transaction.[64]

Wallace argues that the territory of the Purchase Agreement noncompete, all of Texas, is reasonable because Tavernier had been periodically residing in Oregon since 2018 and had potential business opportunities outside Texas, which are not prohibited. It also argues that the scope of barred activity, business brokering, is reasonable because it allows Tavernier to make a living in other business pursuits, and the duration, the later of five years after the purchase or five years after termination of services, is reasonable to protect Wallace's goodwill and confidential information.

In the noncompete in the Independent Contractor Agreement, the territory is limited to "any county in which [Wallace] conducts business," consisting of seven franchise areas. According to Wallace, the noncompete Territory is the greater, all-Texas, territory during the five-year term of the Purchase Agreement and shrinks to the seven-franchise territory only after the five-year period expires and for the balance of the term of the

---

[62] ECF No. 25 at 11–12.
[63] ECF No. 25 at 10.
[64] ECF No. 25 at 10–11.

Independent Contractor Agreement term, which is for at least an additional two years. Wallace argues that the territory restriction is reasonable because Tavernier now lives in Oregon.[65] Wallace argues that the term of the Independent Contractor Agreement, during its term and five years thereafter, is reasonable because Wallace has a legitimate interest in protecting its goodwill and confidential information from Tavernier.

As authority for the reasonableness of the terms of both noncompetes, Wallace cites *Stone*, which held that a five-year noncompete was reasonable to protect the confidential information of the business. Wallace implies that the *Stone* holding supports a determination in this action that a five-year noncompete term, whether after a business purchase or after a term of employment, is reasonable.[66]

### 4. Tavernier's argument

Tavernier asserts that the territory that she owned and sold was not three counties, but instead was three franchises: Denton County as one franchise the cities of Plano and McKinney, which are only part of Cullen County, as two franchise. She asserts that she did not realize that the Purchase Agreement noncompete territory was all of Texas. She also asserts that, when entering into the Independent Contractor Agreement, she did not know which counties Wallace was then or would in the future be doing business.[67]

---

[65] ECF No. 25 at 11–12.
[66] ECF No. 25 at 11, 12.
[67] ECF No. 44 at 2 ¶ 3.

Tavernier argues that *Stone* is authority only that, in that action, there was some evidence on which the trial court could base a finding that five years was reasonable, and the trial court did not abuse its discretion, but *Stone* is not authority that a five-year restraint is reasonable in all cases.[68] Tavernier also argues that Wallace's allegation that it paid a premium for assurance that Tavernier would not be competing against it, which Tavernier denies,[69] does not quantify the premium or explain the specific need for a five-year period.

Tavernier also argues that the all-Texas geographic scope of a noncompete is not reasonable, citing *Stone*.[70]

### 5. Burden of demonstrating compliance with section 15.50

Wallace does not dispute that the noncompetes are ancillary to a personal-service contract and thus described in section 15.51(b), such that Wallace has the burden of establishing that the noncompetes satisfy section 15.50. But Wallace nonetheless argues that, because Tavernier has raised unenforceability of the noncompetes as an affirmative defense, the burden has shifted to Tavernier to demonstrate noncompliance with section 15.50. Wallace cites cases holding that a defendant has the burden of proof on an affirmative defense.[71]

---

[68] ECF No. 42 at 3; *Stone*, 53 S.W.3d at 691
[69] ECF No. 44 at 1 ¶ 1.
[70] ECF No. 42 at 3.
[71] ECF No. 51 at 3.

I disagree. An affirmative defense is a fact that the party seeking relief need neither allege nor prove to prevail but that the opponent can raise and prove to defeat or reduce recovery. Pleading the absence of a claim as an affirmative defense doesn't convert the element's absence to an affirmative defense. Here, even without the third affirmative defense, Tavernier could argue at trial that Wallace hadn't carried its burden of proving compliance.

### 6. Analysis

*Stone* did not decide as a matter of law that a five-year restriction is always reasonable. Reviewing for clear abuse of discretion, the court appeals had ample evidence that it would take five years for the information the employee received while employed to become outdated.

Texas courts have generally held that a reasonable geographical limitation on the employee is the territory where the employee worked for the promisee.[72] In the Texas Court of Appeals' 1996 decision in *John R. Ray & Sons, Inc. v. Stroman*, it held that, for a noncompete applicable to a personal-services occupation, such as sales, "a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his employment."[73] In the court's 1998 decision in *Evan's World Travel, Inc. v. Adams*,[74] it found that the restraint

---

[72] *Stone*, 53 S.W.3d at 695 (citations omitted).
[73] John R. Ray & Sons, Inc. v. Stroman, 923 S.W.2d 80, 85 (Tex. Ct. App. 1996).
[74] 978 S.W.2d 225 (Tex. Ct. App. 1998).

on the former employee from doing business anywhere in the United States or Texas is clearly an unreasonable restriction. It modified the covenant to be only enforceable in the county where the employee worked.[75]

Here, Wallace does not attempt to justify the all-Texas restriction other than to argue that it is reasonable because Tavernier can work outside Texas or pursue other employment. Wallace contends that it paid a premium "for assurance that Defendant would be working with Plaintiff (as a producing salesperson) rather than competing against Plaintiff." Wallace does not quantify the premium or explain why a five-year restraint was necessary for the business.

Wallace has not demonstrated the absence of a genuine issue of material fact regarding the noncompetes' reasonableness, either as to time or territory. I will deny Wallace's motion on the third affirmative defense. This action will proceed to trial with that affirmative defense in the answer.

### C. *Tavernier's fourth affirmative defense: breach of contract for failure to make the Legends reimbursement payments*

Tavernier's fourth affirmative defense, entitled "breach of contract," is that Wallace breached the Independent Contractor Agreement by failing to pay Tavernier all required Legends reimbursement payments.[76] Wallace moves for summary judgment in its favor on that defense because, it argues, its obligation to make those payments was independent of her obligations in

---

[75] *Evan's*, 978 S.W.2d at 233.
[76] ECF No. 15 at 4 ¶¶ 17-18.

the Purchase Agreement and the Independent Contractor Agreement, including the noncompetes. I agree.

### 1. Wallace's motion arguments

According to Wallace, a dependent covenant "is one that goes to the entire consideration of a contract and is conditional on the prior performance of the other party," citing the Texas Court of Appeals' 1992 decision in *D.F.W., Inc. v. Depco Farms, Inc.*[77] If a covenant is only part of the consideration in a contract and its breach can be compensated in damages, it is independent, according to Wallace, citing the Texas Supreme Court's 1982 decision in *Hanks v. GAB Bus. Servs., Inc.*[78] In *Hanks*, the court held that "when a covenant goes only to part of the consideration on both sides and a breach may be compensated for in damages, it is to be regarded as an independent covenant, unless this is contrary to the expressed intent of the parties."

Wallace argues that, as a matter of law, the noncompete in the Independent Contractor Agreement is independent of the Legends-payment obligation in the addendum. According to Wallace, the addendum "was entered into separate and apart from the original basis for entering in the Independent Contract Agreement: [Tavernier's] employment in exchange for [her] agreement not to compete with [Wallace]." And the addendum was entered into approximately two months after execution of the Independent

---

[77] 827 S.W.2d 379, 382 (Tex. Ct. App. 1992).
[78] 644 S.W.2d 707, 708 (Tex. 1992).

Contractor Agreement.[79] Thus, according to Wallace, the parties' reason for entering into the Legends covenant in the addendum is distinct from the purpose for entering into the Independent Contractor Agreement upon the business sale, and Wallace's breach of the Legends covenant "has no bearing" on Tavernier's obligation to observe the noncompete in the Independent Contractor Agreement. The Legends covenant was a "secondary, independent covenant from the Independent Contractor Agreement as a whole" and its noncompete.[80]

Alternatively, Wallace argues that, even if the Legends covenant is dependent, not independent, its breach of that covenant does not excuse Tavernier's breach of the noncompete in the Purchase Agreement, which is independent of the Independent Contractor Agreement. The noncompete in the Purchase Agreement was intended to reflect what Wallace claims to be a premium in the purchase price for Tavernier's agreement not to compete and makes no reference to Legends. The Legends covenant "was part of an entirely separate contract," the addendum.[81]

Finally, Wallace argues that its obligation to make Legends payments "expired" when Wallace and Legends entered into the settlement agreement on December 21, 2019. That's because the addendum allowed Wallace to stop

[79] ECF No. 25 at 14.
[80] ECF No. 25 at 15.
[81] ECF No. 25 at 15.

the Legends payments "[i]f [Tavernier] can end the Legends contract sooner."[82]

### 2.    Tavernier's opposition arguments

Tavernier disputes that the Legends covenant is independent of her covenants under both agreements. As to the Purchase Agreement, Tavernier points to section 17(c), entitling either party to specific performance upon the other party's breach.[83]

Tavernier doesn't specifically address Wallace's second argument—that, within the Independent Contractor Agreement as modified by the addendum, the Legends covenant is independent of the noncompete.

Addressing Wallace's third argument, Tavernier argues that the addendum terminates Wallace's Legends obligation if Tavernier "can end the Legends contract sooner," but that provision doesn't permit Wallace, by itself, to terminate the sponsorship agreement (to which it wasn't a party) and thus reduce its commission payments to Tavernier, nor does the addendum permit Wallace or to breach the addendum by failing to make required payments.[84]

Tavernier concludes by disclaiming any intent that her affirmative defenses "be considered as defenses to state court actions for simple breach of contract claims. They are defenses to [Wallace's] § 523 claims."[85]

---

[82] ECF No. 25 at 16.
[83] ECF No. 42 at 5.
[84] ECF No. 42 at 5–6.
[85] ECF No. 42 at 6.

### 3. Wallace's reply to arguments

In Wallace's reply in support of the motion, it argues that its breach of the addendum by not making the Legends payments could not have breached the Purchase Agreement.[86] Wallace reiterates its original arguments that the Legends covenant is independent of the Independent Contractor Agreement's noncompete.

### 4. Analysis

A breached covenant is dependent if either *Hanks* test is satisfied, The first *Hanks* test is whether the breached covenant "is only part of the consideration in a contract." Here, the breached covenant is the Legends covenant in the addendum. The addendum reduces the commission payments required by the Independent Contractor Agreement and requires Wallace to make the Legends payments. The addendum is, by its terms, a modification of the Independent Contractor Agreement. Considering the entire Independent Contractor Agreement, including the addendum, the consideration from Wallace consists of its agreement to pay commissions to Tavernier plus the Legends covenant. In that sense, the breached Legends covenant is not the only part of the consideration in the contract.

The second *Hanks* test is whether the breach of the covenant can be compensated in damages. Tavernier makes no argument, at least specifically with respect to the Independent Contractor Agreement, that by the nature of

---

[86] ECF No. 51 at 8.

the Legends covenant, a breach could not be compensated by damages. Breach of an obligation such as the Legends covenant—to pay money— usually would be compensable by damages. Tavernier's only argument against damages compensability is based on language in the Purchase Agreement paragraph 17(c) allowing either party to seek specific performance due to the inadequacy of damages. But Tavernier does not argue that the Purchase Agreement should be considered integrated with and thus part of the Independent Contractor Agreement. Under *Hanks*, the Legends covenant is independent and thus did not excuse any breach by Tavernier of the Independent Contractor Agreement or the Purchase Agreement, including the noncompete in either.

Wallace is entitled to summary judgment on the fourth affirmative defense. But Wallace did not affirmatively seek summary judgment in its favor on either of its two nondischargeability claims—even partial summary judgment that the noncompetes are, in fact, enforceable. So, the effect of my granting Wallace's motion on the fourth affirmative defense is only that this action will proceed to trial as though that defense had not been raised.

## V.    Wallace's motion to dismiss Tavernier's fifth affirmative defense of setoff

Tavernier's fifth affirmative defense is that Wallace owes her two $10,000 installment payments owed to Tavernier under section 3(a)((iii) of the

Purchase Agreement and that she may offset the debt it owes to her against any debt that she owes to it.[87]

Wallace moves to dismiss the setoff affirmative defense under Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) permits a party to move to dismiss another party's claim for relief over which the court lacks subject-matter jurisdiction. Wallace argues that the setoff defense is actually a counterclaim that it is property of the estate and, therefore, Tavernier lacks "standing" to pursue this claim.[88] Because Rule 12(b)(1) applies only to a party's claim for relief, the rule applies to the setoff affirmative defense only if it is in fact a claim for relief (a counterclaim) and is not just an affirmative defense.

Tavernier disagrees that the setoff defense is really a counterclaim. She says that she really does have a defense of "recoupment" (which she now says is the correct term), and it truly is a defense, not a counterclaim. She says that she's not trying to obtain any recovery from Wallace on the recoupment theory; she's just trying to reduce the amount of her liability (if any) by the amount of the recoupment. She cites Oregon law that "setoff" and "recoupment" can be stated as affirmative defenses, and they do not support any award of damages in favor of the defendant; they only reduce or eliminate the liability of the defendant.

---

[87] ECF No. 15 at 4 ¶¶ 19–21.
[88] ECF No. 28.

I asked the parties for supplemental briefing on whether, if Wallace is correct that the $20,000 claim can be asserted only the trustee, I should invoke Federal Rule of Civil Procedure 19(a) to order that the trustee be joined in this action as a defendant. The main case remains open. Tavernier urges that I do not order joinder; in her view, the $20,000 cannot be estate property. Wallace urges that I do order joinder—but only if I deny Wallace's motion to dismiss the defense.

Whether the unpaid $20,000 could be offset against a nondischargeable debt due from Tavernier to Wallace would be moot if I determine that no amount of nondischargeable debt is due from Tavernier. For that reason, I will defer to trial further consideration of Wallace's motion to dismiss the setoff (or recoupment) affirmative defense—and whether to order the trustee's joinder.

## VI.    Conclusion

I will deny Tavernier's motion.

I will deny as moot Wallace's motion for summary judgment on Tavernier's second affirmative defense. I will deny Wallace's motion on the third affirmative defense. I will grant Wallace's motion on the fourth affirmative defense.

I will defer until trial consideration of Wallace's motion to dismiss the fifth affirmative defense and whether to order the trustee's joinder.

I will prepare an order.

###